IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LETOURNEAU TECHNOLOGIES        §
DRILLING SYSTEMS, INC.,        §
                               §
          Plaintiff and        §
          Counterdefendant,    §
                               §        CIVIL ACTION NO. H-09-0013
v.                             §
                               §
NOMAC DRILLING, LLC,           §
                               §
          Defendant and        §
          Counterplaintiff.    §

**MEMORANDUM OPINION AND ORDER**

     Plaintiff, LeTourneau Technologies Drilling Systems, Inc. ("LeTourneau"), brings this action against defendant, Nomac Drilling, LLC ("Nomac"), alleging breach of contract, negligent misrepresentation, and promissory estoppel concerning two trans-actions involving the sale of drilling rigs and drives for the rigs (Docket Entry No. 27).  Nomac brings a counterclaim against LeTourneau alleging breach of contract and fraudulent inducement, and seeking rescission of the contract and the return of a substantial down payment on one of the contracts (Docket Entry No. 11).  Pending before the court is LeTourneau's Motion for [Partial] Summary Judgment on Nomac's affirmative defense that the contract is void for failure to meet a condition precedent and Nomac's affirmative defense of fraud and counterclaims for fraud

and fraudulent inducement (Docket Entry No. 28).  For the reasons explained below, the court will grant LeTourneau's motion.

## I.  Factual and Procedural Background

This action concerns a dispute over two Equipment Purchase Agreements ("EPAs") executed between LeTourneau and Nomac in June and July of 2008 for the purchase of nine drilling rigs and nine top drives for the rigs.[1]  LeTourneau is a Texas corporation that manufactures and designs oil and gas drilling equipment.[2]  Nomac is a limited liability corporation with its principal place of business in Oklahoma.  Nomac performs drilling services for its corporate parent, Chesapeake Energy, the largest  independent producer of natural gas in the United States.[3]

LeTourneau and Nomac negotiated the EPAs at issue in the spring and summer of 2008, a period of rapidly rising prices for oil and natural gas.  Nomac was represented in the negotiations by Sam McCaskill, Senior Drilling Advisor, and LeTourneau was represented by Jeremi Ball, a sales representative.[4]  The parties dispute what representations Ball made to McCaskill during these

_____

[1]A top drive is a device that turns the drill string in a drilling rig.  Plaintiff's Motion for [Partial] Summary Judgment ("Plaintiff's Motion"), Docket Entry No. 28, p. 4, n.1.

[2]Plaintiff's Motion, Docket Entry No. 28, p. 9, n.5.

[3]Id.

[4]Affidavit of Sam McCaskill, attached to Defendant's Response to Motion for Partial Summary Judgment ("Defendant's Response"), Docket Entry No. 31, ¶ 2.

-2-

negotiations.  Nomac alleges that in a meeting at Nomac's head-
quarters in El Reno, Oklahoma, on June 5, 2008, Ball represented to
McCaskill and other Nomac employees that "the top drives for the
land drilling rigs would be 350-ton top drives with at least a
28,000 ft-lbs drilling torque rating."[5]  LeTourneau has denied that
Ball made this representation.[6]

On June 17, 2008, the parties entered into an Equipment
Purchase Agreement ("the Rig EPA") pursuant to which LeTourneau
would construct nine land drilling rigs for Nomac for a price of
$90,167,219.[7]  The first rig was to be delivered on October 15,
2008, with the additional rigs to be delivered every two to three
weeks thereafter.[8]  The Rig EPA required a down payment of 25
percent of the purchase price within 10 days of the execution date
of the agreement.[9]  The parties agree that Nomac made a timely down
payment of $22,541,804.75 on the Rig EPA.[10]

The parties entered into a second Equipment Purchase Agreement
on July 24, 2008 ("the Top Drive EPA"), for nine top drives for a

---

[5]Defendant Nomac's Original Answer and Counterclaim, Docket
Entry No. 11, ¶ 13.

[6]LeTourneau's Answer to Defendant Nomac's Counterclaim, Docket
Entry No. 22, ¶¶ 9, 14.

[7]Equipment Purchase Agreement signed June 17, 2008 ("Rig
EPA"), Exhibit C to Plaintiff's Motion, Docket Entry No. 28, p. 2.

[8]Id. at 19.

[9]Id. at 2.

[10]Defendant Nomac's Original Answer and Counterclaim, Docket
Entry No. 11, p. 5.

price of $10,343,781.[11]  The first top drive was to be delivered on October 15, 2008, with the additional top drives to be delivered every two to three weeks thereafter.[12]  The technical specifications state that the top drives can produce a drilling torque of "24,500 ft-lbs., through 115 rpm."[13]  This contract also required a down payment of 25 percent within ten days of the execution date.[14]  It is undisputed that Nomac has never made any down payment on the Top Drive EPA.[15]

The EPAs contain essentially identical legal terms.  Regarding technical specifications, both contracts contain the following terms:

> 5.1  All specifications (the **"Technical Specifications"**) for Equipment delivered in connection with this Agreement shall be as set forth in the Quote.
>
> 5.2  None of the Technical Specification for any Equipment to be delivered pursuant to this Agreement may be amended, modified, altered or changed in any way without the prior written consent of both Parties in accordance with the provisions of Article 4 hereof.[16]

---

[11]Equipment Purchase Agreement signed July 24, 2008 ("Top Drive EPA"), Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 2.

[12]Id. at 27.

[13]Id. at 24.

[14]Id. at 2.

[15]Defendant Nomac's Original Answer and Counterclaim, Docket Entry No. 11, p. 5.

[16]Top Drive EPA, Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 5, §§ 5.1-2; Rig EPA, Exhibit C to Plaintiff's Motion, Docket Entry No. 28, p. 5, §§ 5.1-2.

-4-

Both EPAs also contain merger clauses:

> 17.1   **Entire Agreement**:  This Agreement (including the Schedules and Exhibits hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to the subject matter hereof.[17]

A central dispute between the parties concerns the representations that LeTourneau made to Nomac about the drilling torque of the top drives, and the extent to which Nomac relied on those representations in executing the EPAs.  Nomac has produced an affidavit from McCaskill stating:

> Because the rigs were to be custom-built rigs intended for drilling in a particular area, I told Mr. Ball [LeTourneau's representative] that Nomac needed top drives that could generate at least 28,000 ft-lbs of drilling torque.  Jeremi Ball told me that LeTourneau was developing a top drive that would meet Nomac's requirements.   Mr. Ball told me that a new model LeTourneau's Model DDTD-350 top drive was being developed that would generate at least 28,000 ft-lbs of drilling torque and would likely be capable of at least 30,000 ft-lbs of torque.   Based on Mr. Ball's statements, Nomac signed the Equipment Purchase Agreement for nine rigs and the Equipment Purchase Agreement for nine LeTourneau top drives.[18]

Nomac has not provided any documents created prior to the execution of the EPAs that illuminate the content of the communications between McCaskill and Ball during the negotiations.  McCaskill acknowledges that the Top Drive EPA Nomac signed on July 24, 2008,

---

[17]Top Drive EPA, Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 15, § 17.1; Rig EPA, Exhibit C to Plaintiff's Motion, Docket Entry No. 28, p. 14, § 17.1.

[18]Affidavit of Sam McCaskill, attached to Defendant's Response, Docket Entry No. 31, ¶ 2.

specified that the top drives provided under the contract would
have a drilling torque rating of 24,500 ft-lbs.[19]   McCaskill
asserts, however, that the specification sheet in the contract was
not necessarily intended to govern the contract:

> This specification sheet was included in the agreement
> because Mr. Ball told me that LeTourneau only had this
> specification sheet for the current version of the
> LeTourneau 350-ton top drive, but that LeTourneau would
> produce a specification sheet with the revised torque
> rating for the new version of the top drive that Nomac
> was buying when the new version of the top drive was
> completed and tested.  Based upon this representation
> that Nomac would receive a revised specification sheet
> after testing of the new version, I approved the
> Equipment Purchase Agreement (with the specification
> sheet showing a drilling torque rating of 24,500 ft-lbs
> contract) for execution by David L. Fisher, Vice
> President of Nomac.[20]

Shortly after the execution of the Top Drive EPA the parties
discussed Nomac purchasing an additional top drive.  On August 1,
2008, LeTourneau provided a quote for this additional top drive,
which specified a drilling torque of 24,500 ft-lbs.[21]  McCaskill
sent Ball an e-mail on the same day which stated, "Jeremi I see
this quoted as 24,500 continuous Ft LB Torque, it was my
understanding this was before testing and the end results was much
higher.  Is this rating going to be upgraded."[22]  McCaskill sent

---

[19]Id. ¶ 4.

[20]Id.

[21]Quotation 3411, Exhibit B to Defendant's Response, Docket
Entry No. 31, p. 8.

[22]E-mail from Sam McCaskill to Jeremi Ball, August 1, 2008,
Exhibit C to Defendant's Response, Docket Entry No. 31.

-6-

Ball a second e-mail on the following Monday, August 4, 2008, stating:

> Jeremi, in early discussions you told us that the 24,000 ft # continuous torque was an early assumption before any testing and it was going to be more in the Range of 32,000 the Quote still states 24,000.# what is the case now. this is the 2nd time for this question.[23]

On August 6, 2008, Ball e-mailed McCaskill a revised quote that contained a higher price ($1,223,813 versus $1,091,844 in the August 1 quote) and specified the drilling torque to be "24,500 ft-lbs., through 115 rpm **(To be determined)**" [emphasis in original].[24]

McCaskill responded by e-mail the same day:

> Jeremi, I must have missed out on any communication that you and Jerry had on the performance of this machine. Are you and LTI. Maintaining this 350 ton Top Drive to be Rated at 24,000 FT LB. I remember Verbally conversation of this to be an under rating before testing and the results was more like 30,000#. please respond.[25]

Ball sent an e-mail to McCaskill stating:

> Sam, we are in the process of re-engineering the 350T TD to achieve a better torque rating and have not gotten it to test yet. The rating of the current design is 24,500ft.lbs. and we are shooting for 28,500ft.lbs on version 2. As soon as we can get it built and tested we will provide you with data on the new torque rating.[26]

---

[23]E-mail from Sam McCaskill to Jeremi Ball, August 4, 2008, Exhibit D to Defendant's Response, Docket Entry No. 31.

[24]Quotation No. 33411, Exhibit E to Defendant's Motion, Docket Entry No. 31, pp. 3, 7.

[25]E-mail from Sam McCaskill to Jeremi Ball, August 6, 2008, Exhibit F to Defendant's Response, Docket Entry No. 31.

[26]E-mail from Jeremi Ball to Sam McCaskill, August 6, 2008, Exhibit G to Defendant's Response, Docket Entry No. 31.

-7-

McCaskill then asked, "What are we getting with the 9 Rigs."[27]  Ball responded, "Version 2."[28]

McCaskill's affidavit describes a meeting following these communications:

> In a meeting at LeTourneau's office on August 14, I asked Jeremi Ball about LeTourneau's progress on testing version 2 of the 350-ton top drive and John Franks, a LeTourneau engineer, said that there was no version 2. LeTourneau then offered to substitute a 500-ton top drive, which was normally more expensive, at no additional charge.  However, LeTourneau was never able to make the 500-ton top drive fit the drilling rigs that Nomac had already agreed to purchase.[29]

Neither Nomac nor LeTourneau has provided information beyond their pleadings regarding their communications that occurred between the August 14, 2008, meeting and LeTourneau's filing suit against Nomac on December 13, 2008.  It is undisputed that LeTourneau has not delivered any of the drilling rigs or top drives promised under the contract, and that Nomac has made no payments beyond its initial down payment under the Rig EPA.

On December 13, 2008, LeTourneau filed suit against Nomac in Harris County District Court alleging that "Nomac has threatened to wrongfully terminate both EPAs and demand the return of its down

---

[27]E-mail from Sam McCaskill to Jeremi Ball, August 6, 2008, Exhibit H to Defendant's Response, Docket Entry No. 31.

[28]E-mail from Jeremi Ball to Sam McCaskill, August 6, 2008, Exhibit I to Defendant's Response, Docket Entry No. 31.

[29]Affidavit of Sam McCaskill, attached to Defendant's Response, Docket Entry No. 31, ¶ 6.

-8-

payment."[30]   LeTourneau's original complaint sought a Declara-tory Judgment that it was not in breach of the EPAs, and also sought adequate assurances that Nomac would not repudiate the EPAs.[31] Nomac removed the action to this court on January 5, 2009.[32]   On September 8, 2009, LeTourneau filed a Motion for [Partial] Summary Judgment, seeking summary judgment on Nomac's affirmative defense that the contract is void for failure to meet a condition precedent, and also seeking summary judgment on Nomac's affirmative defense and counterclaims based on fraud and fraudulent inducement.[33]   LeTourneau argues that Nomac's fraud claims must fail, as a matter of law, because these claims are based on oral representations that were superseded by the written terms of the Top Drive EPA.

## II.  <u>Standard of Review</u>

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.   Fed. R. Civ. P. 56(c).   Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

---

[30]Plaintiff's Original Petition and Request for Disclosures, attached to Nomac's Notice of Removal, Docket Entry No. 1, p. 2.

[31]<u>Id.</u> at 2-3.

[32]Nomac's Notice of Removal, Docket Entry No. 1.

[33]Plaintiff's Motion, Docket Entry No. 28.

Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S.Ct. at 2553-2554).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct. at 2553-2554).  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000).  Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

### III.  Nomac's Affirmative Defense that the Top Drive EPA is Void

LeTourneau first seeks summary judgment on Nomac's affirmative defense that the Top Drive EPA is void because a condition precedent to the contract, Nomac's down payment, never occurred. It is undisputed that Nomac never paid the down payment called for in the Top Drive EPA.  LeTourneau argues that under the express terms of the agreement only LeTourneau can enforce this condition precedent.  The relevant provision of the Top Drive EPA states:

> The timely receipt of payment of the Down Payment is a condition precedent to this Agreement becoming effective. If the down payment is not made and received when due, Seller may, at its sole option, declare this Agreement null and void by delivery of written notice to Buyer.[34]

The court concludes that the express terms of the Top Drive EPA give the power to void the contract based on late receipt of down payment only to the Seller, and not the Buyer.  Nomac does not contest LeTourneau's motion for summary judgment regarding this affirmative defense.[35]  Therefore, the court concludes that LeTourneau is entitled to summary judgment on Nomac's affirmative defense that the contract is void because Nomac has failed to make a down payment.

### IV.  Nomac's Claims of Fraud and Fraudulent Inducement

LeTourneau has moved for summary judgment on Nomac's affirmative defense of fraud and Nomac's counterclaims for fraud

---

[34]Top Drive EPA, Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 3, § 2.4 [emphasis added].

[35]Defendant's Response, Docket Entry No. 31, p. 13.

and fraudulent inducement. Both the affirmative defense and the counterclaims are based on the same allegations, which Nomac alleged in its Original Answer and Counterclaim:

> Defendant was induced to agree to the Rig EPA and the Top Drive EPA by a material misrepresentation. Plaintiff misrepresented to Defendant that there was a "Version 2" 350-ton top drive with a drilling torque rating of at least 28,000 ft-lbs. This misrepresentation was material to both the Rig EPA and Top Drive EPA. Plaintiff knew that the misrepresentation was false, or made the misrepresentation recklessly without any knowledge of the truth and as a positive assertion. Plaintiff made the misrepresentation with the intention that it should be acted on by Defendant. Defendant relied on the misrepresentation to its detriment and thereby suffered injury.[36]

Nomac's claims for fraud and fraudulent inducement are based primarily on the representation about the drilling torque of the 350-ton top drives that Ball allegedly made to McCaskill and other Nomac employees on June 5, 2008.[37] LeTourneau denies Nomac's allegations about the representations Ball made at that meeting, but argues that, regardless of what representations Ball may or may not have made, LeTourneau is entitled to summary judgment on Nomac's fraud claims as a matter of law. LeTourneau argues that the Top Drive EPA, as an integrated agreement, precludes enforcement of inconsistent prior statements under the merger doctrine, the statute of frauds, and the doctrine of waiver.

---

[36]Defendant Nomac's Original Answer and Counterclaim, Docket Entry No. 11, ¶ 32.

[37]Id. ¶ 13.

**A.   Applicable Law**

Both of the EPAs specify that they will be governed by Texas law.[38]   Both parties have cited Texas law in their arguments. Accordingly, the court concludes that Texas law governs this dispute.

To prevail on a fraud claim a plaintiff must prove that (1) the defendant made a material misrepresentation that was false; (2) the defendant knew it was false when made or made it recklessly as a positive assertion without any knowledge of its truth; (3) defendant intended the plaintiff to act upon the representation; and (4) plaintiff actually and justifiably relied on the misrepresentation and suffered injury.  <u>See</u> <u>Ernst & Young,</u> <u>L.L.P. v. Pac. Mut. Life Ins. Co.</u>, 51 S.W.3d 573, 577 (Tex. 2001). Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." <u>Haase v. Glazner</u>, 62 S.W.3d 795, 798 (Tex. 2001).  In a fraudulent inducement claim the elements of fraud must be established as they relate to an agreement between the parties.  <u>Id.</u> at 798-99.

A complicating issue in proving the elements of fraud in a contractual context is the parol evidence rule, which holds that extrinsic evidence is generally inadmissible to contradict or vary

---

[38]Top Drive EPA, Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 17, § 17.11; Rig EPA, Exhibit C to Plaintiff's Motion, Docket Entry No. 28, p. 16, § 17.11.

the meaning of the explicit language of a written agreement. National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc., 907 S.W.2d 517, 521 (Tex. 1995). In Texas the parol evidence rule is codified in TEX. BUS. & COM. CODE § 2.202, which states:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (1) by course of performance, course of dealing, or usage of trade (Section 1.303); and
>
> (2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement. TEX. BUS. & COM. CODE § 2.202.

The obvious problem posed by the parol evidence rule to a plaintiff attempting to prove fraudulent inducement is that the rule could bar evidence of the prior oral communications that the plaintiff alleges induced it to enter into the contract. Under Texas law, however, parties challenging contracts as fraudulently induced may rely on evidence of oral promises or agreements to support their claims. Dunbar Medical Sys., Inc. v. Gammex, Inc., 216 F.3d 441, 452 (5th Cir. 2000), citing Santos v. Mid-Continent Refrigerator Co., 471 S.W.2d 568, 569 (Tex. 1971) (per curiam) ("The parol evidence rule will not prevent proof of fraud or mutual mistake."). See also Dallas Farm Mach. Co. v. Reaves, 307 S.W.2d 233, 239 (Tex. 1957) (holding that a merger clause does not bar the use of parol evidence to establish that the contract was induced by fraud).

-14-

While Texas law will allow a plaintiff to introduce evidence of the prior oral communications that allegedly induced the plaintiff to enter into the contract, the court will not disregard the express terms of the contract itself.  To establish the "justifiable reliance" element of a fraud claim, the plaintiff's reliance on the defendant's false statement must have been reasonable.  <u>Ortiz v. Collins</u>, 203 S.W.3d 414, 421 (Tex. App. -- Houston [14th Dist.] 2006, no pet.)  Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.  <u>DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.</u>, 112 S.W.3d 854, 858 (Tex. App. -- Houston [14th Dist.] 2003, pet. denied) (en banc).  <u>See also</u> <u>Fisher Controls Intern., Inc. v. Gibbons</u>, 911 S.W.2d 135, 142 (Tex. App. -- Houston [1st Dist.] 1995, writ denied) ("When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision." (citing <u>Boggan v. Data Sys. Network Corp.</u>, 969 F.2d 149, 153-54 (5th Cir. 1992) (applying Texas law))).  Thus, while a plaintiff may be able to introduce parol evidence of a defendant's misrepresentations in order to prove a claim of fraudulent inducement, where that parol evidence is directly contradicted by the express terms of the written agreement the plaintiff will fail to prove the element of justifiable reliance.  <u>See</u> <u>Schlumberger</u>

-15-

Tech. Corp. v. Swanson, 959 S.W.2d 171, 179 (Tex. 1997) ("fraud
must be something more than merely oral representations that
conflict with the terms of the written contract"; citing
Distributors Investment Co. v. Patton, 110 S.W.2d 47, 48 (Tex.
1937)).

A further factor to consider in evaluating a fraudulent
inducement claim is the presence in the contract of a merger clause
that disclaims reliance on prior oral representations. Texas law
recognizes the power of contracting parties to create contractual
provisions that disclaim reliance on prior representations or
promises. Schlumberger, 959 S.W.2d at 177-180 (disclaimer of
reliance precluded fraud claim based on prior representations).
The court in Schlumberger recognized, however, that such a clause
should not be given effect where the contract was the product of
fraudulent inducement, and therefore unenforceable. Id. at 179.
These two doctrines are potentially contradictory; to steer between
them, Schlumberger directs that "[T]he contract and the
circumstances surrounding its formation determine whether the
disclaimer of reliance is binding." Id. at 179-180 (citations
omitted). If the contract and the circumstances of its formation
evince clear and specific intent to disclaim reliance on prior
representations, then the element of reliance in a fraudulent
inducement claim is negated as a matter of law. Id. at 179. The
Schlumberger court found such clear and specific intent where
sophisticated parties, represented by competent legal counsel,

-16-

included in their contract an emphatic, particularized disclaimer of reliance on prior representations.  Id. at 180.

The Fifth Circuit has considered merger clauses under the Schlumberger standard and has generally enforced them on the basis of contractually evident intent.  See U.S. Quest Ltd. v. Kimmons, 228 F.3d 399, 400 (5th Cir. 2000) (holding that a merger clause stating that the contract was "in lieu of any and all prior or contemporaneous agreements, conditions or understandings" precluded reliance on a prior oral promise); see also Cronus Offshore, Inc. v. Kerr-McGee Oil & Gas Corp., 369 F. Supp. 2d 848, 859 (E.D. Tex. 2004), affirmed, 2005 WL 1023386 (5th Cir. 2005) (unpublished) ("[W]here, as here, a disclaimer of reliance in the contract is negotiated by parties of equal bargaining strength in an arm's-length transaction, it is binding upon the parties and, as a matter of law, precludes claims of both fraudulent inducement and nondisclosure.").

## B.   Analysis

Nomac has alleged that (1) Ball represented that LeTourneau could provide a 350-ton top drive with a drilling torque rating of at least 28,000 ft-lbs; (2) Ball knew this representation was false; (3) Ball made the representation with the intent to induce Nomac to enter into the Rig EPA and Top Drive EPA; (4) Nomac relied on Ball's representation in entering into the EPAs; and (5) Nomac has suffered damages as a result.  Nomac argues that these allegations establish claims for fraud and fraudulent inducement,

-17-

which provide Nomac both counterclaims against LeTourneau and an affirmative defense against LeTourneau's breach of contract claims. LeTourneau has raised a number of arguments against Nomac's claims, including the argument that Nomac has not established the element of justifiable reliance necessary for a fraud claim.   For the reasons explained below, the court concludes that Nomac has not established the element of justifiable reliance regarding either EPA.  Because the facts regarding the Rig EPA and the Top Drive EPA are different, the court will address them separately.

    1.   <u>The Rig EPA</u>

Nomac alleges that it entered into the Rig EPA in reliance upon Ball's oral representation that LeTourneau could produce a 350-ton top drive with a drilling torque rating of at least 28,000 ft-lbs.  Assuming for the sake of this motion that Ball made that representation and that it was false, Nomac must still prove that its reliance on this representation in entering into the contract was reasonable.  There are a number of reasons to conclude that it was not.

First, the Rig EPA contains a merger clause which provides:

17.1 **Entire Agreement**:  This Agreement (including the Schedules and Exhibits hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to the subject matter hereof."[39]

---

[39]Rig EPA, Exhibit C to Plaintiff's Motion, Docket Entry No. 28, § 17.1.

-18-

The statement that the agreement "supersedes all prior agreements and undertakings, both written and oral," appears to disclaim all reliance on prior oral representations, such as the representation Ball allegedly made at the June 5, 2008, meeting. As stated above, Texas courts and the Fifth Circuit have enforced merger clauses where the contract and the circumstances of its formation evince clear and specific intent to disclaim reliance on prior representations. <u>Schlumberger</u>, 959 S.W. 2d at 179.

Three of the factors the <u>Schlumberger</u> court looked to as indicative of intent -- the contract was negotiated at arms-length, by sophisticated parties, with the representation of legal counsel -- are all present in this action.  The parties are both large enterprises with substantial resources and experience in the natural gas drilling business.  LeTourneau has produced an affidavit from its Senior Counsel, who took part in the contract negotiations, which states, "These two agreements were negotiated in good faith by experienced executives from both companies. During the negotiations, both parties were represented by counsel."[40] Nothing in the record suggests that the transaction was not conducted at arms-length.  Although the clause in the Rig EPA appears to be a generic merger clause rather than one specifically crafted for the contract, as was the case in <u>Schlumberger</u>, the

---

[40]Affidavit of Elizabeth Glasgow Schiffer, Exhibit B to Plaintiff's Motion, Docket Entry No. 28, ¶ 3.

Fifth Circuit has found such generic merger clauses to be enforceable. <u>See</u> <u>U.S. Quest</u>, 228 F.3d at 400. Considering the contract and the circumstances under which it was formed, the court concludes that under the <u>Schlumberger</u> standard the merger clause is enforceable, and therefore concludes that the Rig EPA represents the entire agreement of the parties regarding that transaction. Accordingly, the court concludes that it was not reasonable, as a matter of law, for Nomac to rely on Ball's alleged oral representation in entering into the Rig EPA, which makes no mention of any such representation.

Second, even without the merger clause in the contract, the circumstances surrounding the Rig EPA suggest that it would not have been reasonable for Nomac to rely on Ball's representation in entering into that agreement. Put simply, a reasonable company does not enter into a $90 million contract solely on the word of a sales representative that a product, which does not currently exist and which is not even mentioned in the contract, will perform substantially better than the product currently described in the selling company's written technical specifications. If the performance of the other product were material to the buying company in entering into the contract, a reasonable company would at least mention it in the contract, and would likely seek assurances that the other product would perform as required. The Rig EPA together with its accompanying schedules and technical

specifications totals 64 pages; if the torque rating of LeTourneau's top drives was material to the transaction, there was surely space to include it.  Even if it were reasonable not to include assurances in the contract, a reasonable company would demand some form of written assurance outside of the contract that the top drives would perform as Ball allegedly represented.  Nomac has provided no quote, correspondence, or any other document preceding the execution of the Rig EPA that suggests that LeTourneau made the representations about the top drives' drilling torque capacity that Nomac has alleged, or even that Nomac had inquired about the drilling capacity.  The only evidence Nomac has produced is the affidavit testimony of McCaskill that drilling torque was discussed on June 5, 2008, and that Ball orally represented at that meeting that the new 350-ton top drives would have a drilling torque capacity over 28,000 ft-lbs.  Since Nomac had access to the technical specifications for the existing 350-ton drives, which specified a drilling torque capacity of 24,500 ft-lbs., it was on notice that the product described by Ball was a new product that had not yet been tested.  If Nomac truly did rely on Ball's verbal representation about the untested top drives when it entered into a $90 million contract for a different product, for which it paid a down payment of more than $22 million, it was not reasonable to do so.

The court concludes that, even if all of Nomac's allegations are taken as true, Nomac has failed to establish the element of

justifiable reliance on LeTourneau's alleged representations necessary to make a claim for fraudulent inducement of the Rig EPA. Therefore, LeTourneau is entitled to summary judgment on Nomac's fraud defense and counterclaim concerning the Rig EPA.

    2.   <u>The Top Drive EPA</u>

Nomac alleges that it entered into the Top Drive EPA in reliance upon Ball's oral representation that LeTourneau could produce a 350-ton top drive with a drilling torque rating of at least 28,000 ft-lbs. The issues here are somewhat different than for the Rig EPA since the Top Drive EPA actually concerns the product about which Ball allegedly made the representation. LeTourneau argues that since Nomac signed the Top Drive EPA with a technical specification that unambiguously specified a drilling torque capacity of 24,500 ft-lbs., it could not reasonably have relied on Ball's contrary oral representation.

Texas courts have held that reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. <u>DRC Parts</u>, 112 S.W.3d at 858. Here, the Top Drive EPA unambiguously states that the top drives have a drilling torque capacity of 24,500 ft-lbs.[41] It was therefore not justified, as a matter of law, for Nomac to rely on Ball's oral

---

[41]Top Drive EPA, Exhibit A to Plaintiff's Motion, Docket Entry No. 28, p. 24.

representation that the actual drilling torque would be substantially higher.   This conclusion is strengthened by the presence in the contract of clauses 5.1 and 5.2, which state:

> 5.1  All specifications (the "Technical Specifications") for Equipment delivered in connection with this Agreement shall be as set forth in the Quote.
>
> 5.2  None of the Technical Specification for any Equipment to be delivered pursuant to this Agreement may be amended, modified, altered or changed in any way without the prior written consent of both Parties in accordance with the provisions of Article 4 hereof.[42]

The contract thus states that the products purchased will conform to the technical specifications specified in the Quote.   It would be unreasonable for Nomac to conclude from these provisions that the products would actually conform to a different set of technical specifications, to be produced later.   If that was Nomac's understanding, it could have said so in the contract, rather than agreeing to a contract that unambiguously specified a drilling torque capacity of 24,500 ft-lbs.

Like the Rig EPA, the Top Drive EPA also contained a merger clause.[43]   This clause is enforceable for the same reasons as described above for the identical clause in the Rig EPA:   It is part of a contract negotiated at arms-length, by sophisticated parties, with the assistance of counsel, and it expresses a clear intent that the current agreement should supersede all prior oral

---

[42]_Id._ at 5, §§ 5.1-2.

[43]_Id._ at 15, § 17.1.

agreements.   The court concludes that the consequence of this
clause is that the parties disclaimed reliance upon prior oral
agreements, which would make reliance upon Ball's prior oral
representations unreasonable as a matter of law.

Moreover, as with the Rig EPA, the circumstances of the
transaction suggest that Nomac's reliance on Ball's representations
was not reasonable.  If Nomac truly required a top drive capable of
at least 28,000 ft-lbs. of drilling torque, it would not be
reasonable for Nomac to sign a $10 million contract that
unambiguously specifies a product with a lower drilling torque,
solely on the basis of a salesman's word that once the new version
of the product had been tested it would produce a substantially
higher drilling torque.  First, it is unreasonable for a company to
sign a contract that, under its express terms, binds it to purchase
a product that will not meet its needs.  Second, it is unreasonable
for a company to conclude, based solely on the word of a sales
representative, that an untested product will perform substantially
better than the product specified in the selling company's written
specifications.  If a drilling torque capacity of 28,000 ft-lbs.
was material to Nomac, it could have requested written assurances,
either in the contract or outside of it, that the new top drives
would perform as required.  Nomac has produced no evidence of such
assurances that predated execution of the contracts, nor has it
produced evidence that it sought such assurances.  The court
concludes that if Nomac actually relied on Ball's verbal

-24-

representation about the drilling torque of the untested top drives when it entered into a $10 million contract that clearly specified a lower drilling torque, it was not reasonable to do so.

Nomac has provided evidence of communications between the parties subsequent to the execution of the EPAs.[44]  These communications are tangentially relevant to the question of fraudulent inducement of the EPAs in that they shed some light on the communications between the parties during the contract negotiations.  All that these communications establish, however, is that Ball stated before the execution of the EPAs that LeTourneau was developing new top drives, which it expected to produce a torque rating of over 28,000 ft-lbs.  Regardless of how strongly Ball may have worded this expectation, it would not have been reasonable for Nomac to rely on Ball's statement, in the absence of any written confirmation, in executing contracts for more than $100 million of equipment that contained no assurances as to Ball's representations.

The court concludes that, even if all of Nomac's allegations are taken as true, Nomac has failed to establish the element of justifiable reliance on LeTourneau's representations necessary to make a claim for fraudulent inducement of the Top Drive EPA. Therefore, LeTourneau is entitled to summary judgment on Nomac's fraud defense and counterclaim concerning the Top Drive EPA.

---

[44]Exhibits A through I to Defendant's Response, Docket Entry No. 31.

## V.  <u>Conclusion and Order</u>

For the reasons explained above, LeTourneau's Motion for [Partial] Summary Judgment (Docket Entry No. 28) is **GRANTED**. LeTourneau is entitled to summary judgment on Nomac's affirmative defense that the Top Drive EPA is void for failure to meet a condition precedent.  LeTourneau is also entitled to summary judgment on Nomac's affirmative defense and counterclaims based in fraud and fraudulent inducement.

**SIGNED** at Houston, Texas, on this 28th day of October, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE